[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM
The named defendant owned substantial acreage in Prospect, which from time to time was subdivided into building lots. At the time of the initial contact between the parties he was simply selling lots to customers who would then erect homes on their purchase. At that time, the plaintiff was a licensed real estate salesman working for a licensed real estate broker who obtained listings on various lots. The plaintiff did obtain several customers on terms acceptable to the defendant and a number of sales of lots were accomplished. Eventually, the plaintiff persuaded the defendant that it would be more profitable for him to construct houses and sell the completed units than to simply sell bare land. The defendant expressed some degree of reluctance to becoming involved with customers and sub contractors with the result that the plaintiff offered to act as a buffer between him and customers, aiding prospects in selecting plans from prints furnished by the defendant and also aiding them in choosing such details as fixtures, colors, carpeting and a myriad of like matters, and also, in arranging for the services of sub contractors. She continued to interest prospects in purchasing homes from the defendant, arranged for sales contracts and attended closings. She actively participated in supervising construction. It was clear from the very start that the defendant retained control of the operation; he set prices; the plaintiff simply recommended sub contractors, but the final decision as to whom to hire was made by him, as well as any decision to fire. Originally, the plaintiff continued to maintain her relationship with a licensed real estate broker, but the brokers no longer had listing for the properties. The last of the brokers with whom she was associated was told quite emphatically by the defendant that with respect to his operation, the plaintiff worked for the defendant, and not for the broker. Neither of the last two CT Page 4581 brokers with whom she had been associated received any commission from the sale of any properties after this enlarged relationship was entered into by the parties. Mrs. Anderson became concerned that the lack of listing agreements and Schieffer's insistence that she was working for him and not for the broker might get her in trouble with the Real Estate Commission. Therefore, to assure that she came under he exception from the requirements of Chapter 392 as set forth in Connecticut General Statutes 20-329, that she was a regular employee of the land owner, that her actions were performed in the regular course of management of the property, Schieffer authorized the performance of any contract of sale she suggested, and he agreed that they could memorialize the relationship between them with a written employment contract, which was done on May 21, 1986. It sets forth that she "is now and has been engaged in the business of managing real estate, including the supervision of construction and hiring and firing sub-contractors", and that she is to "supervise the construction and sale of houses for" Schieffer. This document in no way changed the fact that she was already a regular employee. He definitely exercised the control over her activities that is part and parcel of the employer relationship. Darling v. Burrone Bros., Inc., 162 Conn. 187. His protest on the stand that he had no recollection of executing the May 21, 1986 agreement and did not recognize his signature on a document witnessed by his wife is ludicrous. It directly contradicts testimony by his own lawyer that he participated in drawing up the contract. His signature is a precise duplication of what appears on many other documents in evidence, many of which were introduced by the defendant. That20-329 was amended during the course of their relationship to narrow the exception to "regular employees who are employed as on-site residential superintendents" did not change her qualification for the exception as by that time, she was living in a home in the development, and was engaged in supervision on a daily basis. During the course of the relationship, Schieffer formed a corporation, Paul J. Schieffer, Inc., which took over the supervisory function previously exercised by him personally. The defendant attempts to make much of the fact that the corporation never became a formal party to the contract of May 21, 1986. I fail to see the significance of this. The control exercised created an employer-employee relationship regardless of whether or not it was evidenced by a writing. Furthermore, the corporation accepted the benefit of her services with knowledge of the contract. Cohan v. Holloway's, Inc., 158 Conn. 395, 409. Also, during the course of the relationship, Mrs. Anderson directed and the defendants complied with the direction, that payments be made to a corporation she controlled, Anderson Home Planners, Inc. I fail to see any significance of that to the liability of the defendants. That compensation was to be calculated on a commission basis does not have impact on the relationship. Connecticut General Statutes 31-712(3). And the fact that CT Page 4582 neither Shieffer nor his corporation obeyed Federal law as to withholding of income or social security taxes cannot be deemed to alter the relationship.
Schieffer maintains that the relationship between the parties was orally terminated by him sometime around the second week of October 1987. This is completely inconsistent with the documentation submitted that Mrs. Anderson continued to render services, which were accepted by the defendants and that she received compensation at least through November and stopped only in compliance with a letter from the defendant's attorney, dated January 13, 1988. If she was terminated in October, why a letter the following January? If the May, 1986 contract governs their relationship, under paragraph 4, either party was free to terminate the relationship at any time, and with or without cause on notice to the other. If that document does not govern, she was an employee at will, and could be terminated in like manner. That paragraph goes on to state "the rights of the employee to any commission which accrued prior to said notice, shall not be divested by the termination of this contract." As a matter of law that would be the rule even if the contract does not apply.
As of January 13, 1988, Lot 95 was under a contract of sale and was complete except for the installation of carpeting. It eventually sold in April for $275,000, but under the contract obtained by the plaintiff, the price was $227,000, and she had nothing to do with obtaining the buyer who ultimately closed at the higher price. Lot 80 was complete except for some finish flooring. It was under contract obtained by Mrs. Anderson for sale at $305,000. Closing was during March, 1988. Lot 23 closed on March 21, 1988, for a price of $235,000. The contract was obtained by the plaintiff. The purchasers testified that in December 1987, they met with the plaintiff to decide upon carpets, tiles and other finishing items. Contract of sale was executed in November, 1987, and was obtained by the plaintiff. Lot 20 went under contract on June 10, 1987, obtained by the plaintiff, at a price of $250,000. It closed on January 29, 1988. Lot 21 contained a spec house and was not under contract as of January 13. However, by that date, it was at least 50% complete. Lot 88 was also a spec house, and there was no contract, but as of the termination date, was at least 50% complete. Lot 89 was again a spec house, there was no contract as of January 13, but again, it was at least 50% complete. Lot 90 falls into the same category as the three prior properties. Interestingly, at trial, Schieffer denied that Mrs. Anderson did any supervision on the properties, but on cross examination, admitted that his testimony at a deposition was directly contrary. Lot 21 sold for $239,000, Lot 88 sold for $221,000.
As to the four completed houses, I conclude that Mrs. CT Page 4583 Anderson is entitled to her 6% commission. As to Lot 95, that should be computed on the price she had obtained rather than the much higher price with which she had nothing to do. That computes to $61,020. However, she has received $3,000 on account for each of them at the time of the deposit, reducing the net amount due to $49,020. As to the four incomplete properties, the contract specifies that termination would have no impact on her right to commissions. Even absent such a provision, the law would allow her to recover for the reasonable value of her services. The only evidence before me is that each of the four was at least 50% complete, and that she actively participated in supervision. Mrs. Anderson urges that because each of these four were at least 50% complete, she should receive half of the commission, or 3%. However, this ignores the fact that over and above supervision an important part of her performance was to obtain a purchaser and a sales contract, which she did not do. I am satisfied that she did provide supervision and is entitled to be reimbursed for that, but as noted she produced no evidence as to the reasonable value of the work she did do, so she is inviting me to speculate upon that value, something I cannot do. Therefore, the most I can award her is nominal damages, or $100 per property, for a total of $400.
Mrs. Anderson claims double damages and reasonable attorney's fees, pursuant to Connecticut General Statutes 31-72. I have no difficulty in finding that the failure to pay with respect to the four completed properties demonstrated bad faith, arbitrariness and unreasonableness. Crowther v. Gerber Garment Technology, Inc., 8 Conn. App. 254. The amount due her was readily liquidated by application of simple arithmetic and there was no justification for withholding her commission. Therefore, the $49,020 should be Schieffer. This I need not do as it is clear that her services constituted a benefit to each of them.
By counterclaim, the defendant seeks to recover commissions paid to Mrs. Anderson, claiming such payment was unlawful, as she was not working for a licensed real estate broker who had listings for the property. This is entirely without merit, as I have already found that she clearly came within the exemption from such requirements. He also seeks damages from her for maintaining a spurious law suit. In view of my findings, this claim is also completely without merit. He also alleges violation by her of fair dealing with him as required by the nature of their relationship, but he has utterly failed to prove any of those allegations. He also seeks a set off of any award given her by the amount of commissions illegally paid and received by her. This again is based upon the same allegations made in his counterclaim, which I find to be without merit.
The defendant has also moved to dismiss the action, again alleging that she was not acting for a licensed real estate broker CT Page 4584 who had listings. Repetition of those allegations adds nothing to them.
The defendant has also interposed four special defenses. The first alleges that Mrs. Anderson was not an employee, but an independent contractor. This is negated by the very extensive control which the defendant had over the plaintiff. The second, third and fourth are predicated upon the concept that she did not qualify for the exemption accorded an employee. His characterization of the employment contract as an attempt to circumvent the law is ridiculous. Far from being a circumvention, it was a successful effort to comply with the law.
I realize that much of my factual findings were vigorously disputed by the defendant. To be charitable, I will only note that his credibility leaves much to be desired. Not only was his testimony at variance with that given at depositions and contrary to documentation, but while on the stand, he was evasive.
Judgment may enter for the plaintiff on the complaint in the amount of $123,240, which includes the doubling of $49,020, and attorneys fees of $24,800, costs to be taxed. Judgment may enter for the plaintiff on the counterclaim and the setoff.
HEALEY, STR